NEWBY INTERNATIONAL, INC., f/k/a
Fibar, Inc., and PMI/WMU Properties,
d/b/a P.M.I. and d/b/a Midwest Envi-
ronmental Recycling, Inc., Plaintiffs–
Appellants,

v.

NAUTILUS INSURANCE CO.,
Defendant–Appellee.

No. 03–1360.

United States Court of Appeals,
Sixth Circuit.

Sept. 10, 2004.

Rehearing Denied Oct. 12, 2004.

Mark L. McAlpine, Linda S. McAlpine,
McAlpine & McAlpine, P.C., Auburn Hills,
MI, for Plaintiffs–Appellants.

John H. Dise, Jr., Dise & Associates,
Southfield, MI, for Defendant–Appellee.

Before MOORE and COLE, Circuit Judges; and MARBLEY,* District Judge.

## OPINION

MOORE, Circuit Judge.

Plaintiffs–Appellants, Newby International, Inc., formerly known as Fibar, Inc. ("Fibar"), and PMI/WMU Properties ("PMI"), appeal the district court's order denying their motion for summary judgment and granting Defendant–Appellee, Nautilus Insurance Co. ("Nautilus")'s motion for summary judgment and the district court's order denying Plaintiffs–Appellants' motion for a rehearing. This action arises out of the construction of playgrounds for which PMI and Putt, Inc. ("Putt") supplied wood chips, Fibar supplied other flooring materials, and Wayne Oakland Landscaping ("WOL") performed construction. PMI supplied defective wood chips containing metal debris. Fibar sought from Nautilus, PMI's insurer, indemnification for the cost of removing the defective wood chips and repairing the playgrounds. On appeal, Plaintiffs–Appellants assert that the district court erred by concluding that this incident was not an "occurrence" within the meaning of PMI's comprehensive general liability ("CGL") policy, and therefore, holding that the CGL policy does not provide coverage for the cost of removing the wood chips and repairing the playgrounds. Plaintiffs–Appellants argue that PMI's defective wood chips damaged the wood chips supplied by Putt, the flooring materials supplied by Fibar, and the work performed by WOL, thereby causing "property damage," that this damage was an accident, and therefore, that there was an "occurrence" within the meaning of the CGL policy.

Although not addressed by the district court, the parties dispute on appeal whether several policy exclusions in the CGL policy preclude coverage for this incident.

For the following reasons, we RE-VERSE the district court's order granting summary judgment to Nautilus and RE-MAND this case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

The parties submitted to the district court a stipulation of facts. "In April 1999, Nautilus issued a Commercial Lines Policy, Policy No. NC 082363, to PMI which was in effect from April 8, 1999 to May 19, 2000." Joint Appendix ("J.A.") at 109 (Stipulation). The policy provided $1,000,000 of coverage for each occurrence and $1,000,000 general-aggregate coverage. "PMI is a named insured under the policy [and] Fibar is an additional insured under the policy." J.A. at 109 (Stipulation).

In 1999, the Warren Consolidated School District ("School District") accepted three bid packages for the installation of playground equipment at several schools; Wayne Oakland Landscaping ("WOL") was awarded installation work at twelve schools pursuant to bid package # 2 and Continental Leisure Sales ("CLS") was awarded the rest of the installation work pursuant to bid packages # 1 and # 3. WOL's contract with the School District required WOL to construct and install "graded grassy areas, asphalt pathways, new playground equipment, safety flooring under the play ground equipment, and a

---

* The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

drainage system consisting of appropriate grading, drain tile and pea stone." J.A. at 110 (Stipulation). WOL contracted to purchase from Fibar "the safety flooring system for the twelve school play grounds." J.A. at 110 (Stipulation). Fibar developed and sells the Fibar System 200, "a safety flooring system for playgrounds." J.A. at 109 (Stipulation). The Fibar System 200 "consist[s] of a layer of geotextile fabric, a layer of drainage stone and another layer of geotextile fabric on top of the stone. Engineered wood fib[er] is placed on top of the fabric and stone." J.A. at 109 (Stipulation).

Fibar contracted to purchase wood chips from PMI and Putt for use in Fibar's safety flooring systems. "PMI agreed to provide only non-recycled virgin wood, cut to certain specifications. Fibar provided the remaining components of the system. Neither PMI nor Fibar installed any of the system or component parts." J.A. at 110 (Stipulation). Between September 1999 and July 2000, the wood chips were delivered by truck to the twelve schools.

In September 2000, Rick Green, the head of operations for the School District, "informed Fibar that employees of the school district had found metal in the wood fiber at Hatherly School, and nails, staples and other metal objects at all of the playground sites to which the PMI material had been delivered." J.A. at 110 (Stipulation). "The school district demanded that Fibar remove all of the nonconforming material at all of the sites where the nonconforming material was found." J.A. at 110 (Stipulation). Fibar hired Wayne Oakland Contracting ("WOC") to remove the nonconforming "product and material" from the playgrounds and to restore the sites. J.A. at 110. The removal and repair process involved the following:

At Hatherly, one of the schools, eight to twelve inches of the wood fiber material was removed by vacuum truck and new material was put in place. Also repaired was damage to the concrete, asphalt, grading, landscape and drainage systems caused by the machinery during the removal process.

For the other schools, the School District agreed that only the top 8″ of material needed to be removed and replaced with 12″ of material. This process required hand shoveling the fiber to be removed into buckets on front-end loaders and Bobcat skidsters. Restoration of the site was required due to damage to the concrete, asphalt, grading, landscaping and drainage systems caused by the machinery during the removal process.

J.A. at 110–11 (Stipulation).

"On September 29, 2000, Fibar notified PMI of the claim by the Warren School District." J.A. at 111 (Stipulation). In a letter dated October 10, 2000, Nautilus initially refused to defend PMI or to provide indemnification for the loss because the date of loss initially provided by PMI was September 28, 2000, and PMI's policy with Nautilus had been cancelled on May 19, 2000. "On October 11, 2000, counsel for PMI notified Nautilus of the arbitration demand that had been filed by Fibar, provided documentation that the deliveries in question occurred between September 1999 and May 2000, and requested that Nautilus defend and indemnify PMI in the arbitration action." J.A. at 111 (Stipulation). Nautilus responded by sending a reservation of rights letter dated November 22, 2000. On March 1, 2001, after negotiations, "Nautilus agreed to defend PMI with regard to the arbitration scheduled between Fibar and PMI, but specifically reserved its rights to decline indemnification." J.A. at 111 (Stipulation). The arbitrator awarded Fibar $714,000.32 against PMI, "representing some of the

costs alleged by Fibar, but not all of the costs incurred by Fibar as a result of removing and replacing the nonconforming fiber material, and repairing the property damaged during the process." J.A. at 112 (Stipulation).

### B. Procedural Background

On February 12, 2002, Plaintiffs–Appellants filed in the district court a three-count complaint against Nautilus. In Count I, PMI sought a declaratory judgment holding that Nautilus had a duty to indemnify PMI as the named insured on the CGL policy at issue. In Count II, Fibar sought a declaratory judgment holding that Nautilus had a duty to indemnify Fibar as an additional insured on the CGL policy. In Count III, PMI sought damages arising from Nautilus's alleged breach of the CGL policy.

On January 29, 2003, the district judge granted from the bench Nautilus's motion for summary judgment and simultaneously denied Plaintiffs–Appellants' motion for summary judgment. The district judge concluded that Plaintiffs–Appellants had merely alleged faulty workmanship, which does not qualify as "property damage" or an "occurrence" under the CGL policy. The district judge also concluded that Plaintiffs–Appellants were seeking reimbursement for the costs of removing and replacing its own product, which had not caused "property damage" in the first place, and that such costs were not covered by the CGL policy.

In April 2003, the district judge issued a written order and opinion denying Plaintiffs–Appellants' motion for a rehearing. In explaining his conclusion that there was no "occurrence" within the meaning of the CGL policy, the district judge wrote: "In the present case, the faulty woodchips did not 'leak,' or in other words, any harm caused was limited entirely to the ground

upon which they lay, and once they were removed, there was not additional collateral damage." J.A. at 585 (Dist.Ct.Op.). In rejecting Plaintiffs–Appellants' argument that the damage caused to the playgrounds by the removal of the defective wood chips triggered coverage, the district judge stated that "there has not been an 'occurrence' of the sort for which Nautilus is required to provide coverage. Because there has not been such a condition precedent, any subsequent related activities are not covered either." J.A. at 585 (Dist.Ct.Op.).

The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff–Appellant Fibar is incorporated in New York with its principal place of business in New York, and Plaintiff–Appellant PMI is incorporated in Michigan with its principal place of business in Michigan, while Defendant–Appellee Nautilus is incorporated in Arizona with its principal place of business in Arizona, and because Plaintiffs–Appellants seek indemnification in an amount greater than $700,000, well in excess of the amount-in-controversy jurisdictional requirement. This court has jurisdiction pursuant to 28 U.S.C. § 1291 because Plaintiffs–Appellants filed timely notices of appeal.

## II. ANALYSIS

### A. Insuring Agreement

Plaintiffs–Appellants argue on appeal that this incident is covered under the CGL policy because PMI's defective product caused *physical injury* to the property of another and because this *physical injury* was an accident. Plaintiffs–Appellants further assert that the CGL policy does not distinguish between direct and indirect causation, and therefore, "property damage" caused by remediation efforts also constitutes an "occurrence" under the CGL policy. Plaintiffs–Appellants point

out that they are not seeking indemnification for the cost of replacing PMI's defective wood chips; rather they are seeking indemnification for the damages done to Putt's, Fibar's, and WOL's products and work.

In response, Nautilus argues that PMI's defective product did not cause *physical injury* to the property of another, and therefore, that there was no "occurrence" triggering liability under the CGL policy. Nautilus further argues that because there was no "occurrence," there is no coverage for any damage that may have occurred during the removal of PMI's defective wood chips. Nautilus asserts that many of the cases cited by Plaintiffs–Appellants are distinguishable, in that they address pre–1973 policies when the triggering event was " 'injury to' the property of others," which courts had defined as including loss of value. Nautilus maintains that post–1973 policies, including the CGL policy at issue in this case, typically require *physical injury* to the property of others. Nautilus claims that this incident is similar to cases in which the installation of a defective component merely caused a diminution in value and did not constitute an "occurrence."

The insuring agreement in the CGL policy provides:

This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

J.A. at 18, 153 (CGL policy). The CGL policy defines "occurrence" in the following manner: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." J.A. at 28, 163 (CGL policy). The policy defines "property damage" in the following manner:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

J.A. at 29, 164 (CGL policy).

Synthesizing relevant precedent[1] leads to the rule that an insuring agreement in a CGL policy, such as the one involved in this case, may provide coverage if an insured's defective workmanship causes "property damage" to the work or property of another, but that a CGL policy does not provide coverage if the insured's defective workmanship damages only the insured's work or product. *Bundy Tubing Co. v. Royal Indem. Co.*, 298 F.2d 151, 153 (6th Cir.1962) (holding that the CGL policy provided coverage for the removal and replacement of the concrete floor in which tubing supplied by the insured had been placed because the defective tubing damaged the heating system in which it was installed); *Calvert Ins. Co. v. Herbert Roofing & Insulation Co.*, 807 F.Supp. 435, 438–39 (E.D.Mich.1992) (holding that the CGL policy provided coverage because the roof installed by the insured leaked, causing damage to the building and personal property); *Hawkeye–Sec. Ins. Co. v. Vector Constr. Co.*, 185 Mich.App. 369, 460 N.W.2d 329, 333 (1990) (holding that the CGL policy did not provide coverage when

---

1.  The parties agree that this diversity case must be decided under Michigan law.

the insured used non-conforming cement when installing a roof because the roof did not damage work or property of another). In *Calvert*, 807 F.Supp. at 438, the district judge explained:

> The holdings in *Bundy* and *Vector* can be reconciled by focusing on the property damage at issue in each case. In *Vector*, the insured's defective workmanship resulted only in damage to the insured's work product. In *Bundy*, the insured's defective workmanship resulted in damage to the property of others. Taken together, these cases stand for the proposition that when an insured's defective workmanship results in damage to the property of others, an "accident" exists within the meaning of the standard comprehensive liability policy.

Indeed, the parties agree that this is the current state of Michigan law.[2]

■ In concluding that PMI's wood chips did not cause any damage to the property of another, the district court improperly resolved a factual dispute in favor of Nautilus. The stipulation of facts indicates that wood chips supplied by both PMI and Putt were installed at the playgrounds. Additionally, PMI has produced evidence that a greater volume of wood chips was removed from the playgrounds than was originally supplied by PMI. Finally, PMI has produced evidence that the wood chips supplied by PMI and Putt were raked together. If the metal debris contained in the wood chips supplied by PMI contaminated the wood chips supplied by Putt, then PMI caused *physical injury* to Putt's wood chips, and thus caused "property damage."

■ Although the School District may not have discovered the metal debris until after the expiration of the CGL policy, PMI has produced evidence that its product may have caused "property damage" prior to the expiration of the CGL policy. The Michigan Supreme Court held that a CGL policy with an identical insuring clause dictates an injury-in-fact approach for determining whether an occurrence falls within the policy period. *Gelman Sciences, Inc. v. Fid. & Cas. Co. of N.Y.*, 456 Mich. 305, 572 N.W.2d 617, 623–24 (1998), *overruled on other grounds by Wilkie v. Auto–Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003). Under the injury-in-fact approach, the operative date is the date upon which the wood chips supplied by PMI damaged the property of another, and not the date upon which the School District discovered the damage. Contrary to the district court, we conclude that there is a genuine issue of material fact as to *whether* and *when* the debris contained in the wood chips supplied by PMI caused *physical injury* to the wood chips supplied by Putt.

**2.** Nautilus points out that in some of the cases cited by Plaintiffs–Appellants, the insuring agreement simply required property damage, and that courts had interpreted property damage as including mere loss in value of the property of another. *Capitol Reprod., Inc. v. Hartford Ins. Co.*, 800 F.2d 617, 621–22 (6th Cir.1986) (holding that there was a loss in value of the developer's land, and thus "property damage" under a CGL policy, when errors in a survey performed by the insured led to the improper placement of sewers); *Economy Mills of Elwell, Inc. v. Motorists Mut. Ins. Co.*, 8 Mich.App. 451, 154 N.W.2d 659, 663– 64 (1967) (holding that there was a loss in value of the purchaser's fields, and thus "property damage" under a CGL policy, when seeds sold by the insured failed to sprout). Nautilus further points out that in response to this interpretation, standard CGL policies were amended to require *physical injury*, which requires more than a mere loss in value. While Plaintiffs–Appellants' reliance on the above cited cases may be misplaced, Plaintiffs–Appellants have provided evidence that the wood chips supplied by PMI caused *physical injury* to the property of another.

Plaintiffs–Appellants have also produced evidence that the metal debris contained in the wood chips supplied by PMI rendered parts of the playgrounds unusable. This case is analogous to the asbestos and other contamination cases, in that the metal debris did more than merely diminish the value of the flooring systems, but rather it also contaminated the flooring systems, rendering them hazardous. *See United States Fid. & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926, 931–32 (1991) (holding that the insurer had a duty to defend the insured under a CGL policy that defined "property damage" as physical injury, when asbestos-containing products manufactured by the insured continuously emitted toxic fibers into the air, creating a safety hazard); *see also Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.,* 78 Cal. App.4th 847, 93 Cal.Rptr.2d 364 (2000) (holding that the insurer had a duty to indemnify under a CGL policy that defined "property damage" as physical injury, when the insured supplied almonds contaminated with wood splinters that were incorporated into nut clusters and then into cereal because the almonds rendered the finished product unsafe). Therefore, the metal debris in the wood chips supplied by PMI may have caused *physical injury* to the entire flooring system. Although the School District may not have discovered the metal debris until after the expiration of the CGL policy, Plaintiffs–Appellants have produced evidence that PMI's wood chips may have caused "property damage" (injury-in-fact) prior to the expiration of the CGL policy. Moreover, the CGL also defines "property damage" as encompassing, "Loss of use of tangible property that is not physically injured." J.A. at 29, 164 (CGL policy). Although the School District may not have stopped using the playgrounds until after the expiration of the CGL policy, the CGL policy

expressly provides, "All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it," and Plaintiffs–Appellants have presented evidence that there was an "occurrence" within the policy period. J.A. at 29, 164 (CGL policy). Contrary to the district court, we conclude that there is a genuine issue of material fact as to *whether* and *when* the wood chips supplied by PMI caused *physical injury* to the entire flooring systems or caused the School District to suffer a loss of use of their playgrounds.

While the cases cited by Plaintiffs–Appellants do not address the issue of "property damage" caused by direct or indirect causation, *Bundy* does support Plaintiffs–Appellants' claim for indemnification for the costs of remediation. *Bundy* indicates that once an "occurrence" triggers the insuring agreement, an insured may be entitled to indemnification for the cost of remedying the "property damage," even damage caused by the removal process. *Bundy,* 298 F.2d at 153. *Vector* indicates, however, that if there is no "occurrence," then the insured is not entitled to indemnification for the cost of remedying the damage caused by the removal process. *Vector,* 460 N.W.2d at 334. Because there may have been an "occurrence," PMI may be entitled to indemnification for the cost of remedying the "property damage," including the damage caused by the removal process.

Plaintiffs–Appellants argue that the *physical injury* and loss of use constituted an accident because PMI did not intend to supply defective wood chips and because the damage was not reasonably foreseeable. In response, Nautilus argues that under Michigan law, when the insured's defective workmanship causes damage only to the insured's work product, there can be no accident within the meaning of a CGL policy. *Bundy* supports Plaintiffs–

Appellants' position that an unexpected failure of the insured's product that causes damage to the property of another constitutes an accident within the meaning of a CGL policy. *Bundy*, 298 F.2d at 153 ("The failure of the tubing in the heating system in a relatively short time was unforeseen, unexpected and unintended. Damage to the property was therefore caused by accident."). Moreover, under Michigan law, an intentional act can give rise to an accident within the meaning of a CGL policy, if the consequences are not reasonably foreseeable from the standpoint of the insured. In *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 595 N.W.2d 832 (1999), the Michigan Supreme Court explained that

> we have repeatedly stated that "an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." After some debate concerning the issue, we have also held that the definition of accident should be framed from the standpoint of the insured, not the injured party....
>
> . . .
>
> We also hold that the appropriate focus of the term "accident" must be on both "the injury-causing *act* or *event* and its relation to the resulting property damage or personal injury."

*Id.* at 838 (internal citations omitted). While PMI intentionally supplied wood chips, there is no evidence that PMI intentionally supplied contaminated wood chips, and there is a genuine issue of material fact as to whether PMI could have reasonably foreseen that its wood chips would injure the property of another. Plaintiffs–Appellants have created a genuine issue of material fact regarding whether the "property damage" was caused by an accident, and thus constitutes an "occurrence," triggering coverage under the insuring agreement.

B. Exclusions

The district court held that there was no "occurrence" within the meaning of the CGL policy, and therefore, it did not rule upon the applicability of any of the policy exclusions. Nautilus asserts that the "your product" exclusion, the "your work" exclusion, the "damage to property" exclusion, the "impaired property" exclusion, the "contractual liability" exclusion, and the "products-completed operations" exclusion preclude coverage for this incident and urge us to affirm the district court upon this basis. Plaintiffs–Appellants assert that Nautilus should be estopped from asserting the "contractual liability" exclusion and the "products-completed operations" exclusion because Nautilus failed to assert them in its reservation of rights letters or as affirmative defenses in its answer. Plaintiffs–Appellants further argue that the conflict between a typewritten provision on the declarations page and a preprinted endorsement must be resolved by finding that the CGL policy covers incidents falling within the "products-completed operations" hazard. Finally, Plaintiffs–Appellants argue that none of the exclusions apply to the incident that gave rise to this litigation.

We decline to rule at this juncture upon the applicability of most of these exclusions because many of them turn upon factual issues that should be addressed in the first instance by the district court. Similarly, as will be discussed below, Plaintiffs–Appellants' assertion that Nautilus has waived or should be estopped from raising the "contractual liability" exclusion and the "products-completed operations" exclusion turns upon factual issues that should be addressed in the first instance by the district court. We will, however,

rule upon one question of law: the effect of the conflict between a typewritten provision on the declarations page and a preprinted endorsement regarding the existence of coverage for incidents falling within the "products-completed operations" hazard.

1. "Products-completed operations" exclusion

█ Putting aside the issues of estoppel and waiver, we note that the CGL policy contains conflicting terms regarding the existence of coverage for incidents falling within the "products-completed operations" hazard. On the declarations page of the CGL policy, $1,000,000 is specifically typed onto the line corresponding to "Products/Completed Operations Aggregate Limit" in the section of the declarations page pertaining to limits of insurance. J.A. at 17, 400 (CGL policy). Both Michigan case law and an authoritative treatise on insurance indicate that the typewritten provision on the declarations page indicating that PMI had $1,000,000 coverage for "products-completed operations" controls over the preprinted endorsement excluding such coverage. *Martin v. Ohio Cas. Ins. Co.*, 9 Mich.App. 598, 157 N.W.2d 827, 829 (1968); 9 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 22:4 (3d ed. 1995) ("[W]here a conflict exists between typewritten words on the face of the policy and a printed endorsement, the rule that typewritten portions will be given effect over printed portions controls over the rule that an endorsement will be given effect when in conflict with the body of the policy."). This conclusion

is further buttressed by the rule that any ambiguity in an insurance contract must be construed against the insurer-drafter of the policy and in favor of the insured.[3] Therefore, we conclude that the "products-completed operations" exclusion in the CGL policy issued by Nautilus to PMI is inoperative.

2. Estoppel and Waiver

Plaintiffs–Appellants argue that Nautilus should be estopped from asserting the "contractual liability" exclusion and the "products-completed operations" exclusion because it failed to mention these exclusions in its reservation of rights letters. Having already concluded that the "products-completed operations" exclusion is inoperative, we limit our discussion of waiver and estoppel to the "contractual liability" exclusion. The Michigan Supreme Court has indicated that generally the doctrine of estoppel should not be used to broaden the scope of insurance coverage, so long as the insurer provides reasonable notice that it is proceeding under a reservation of rights. *Kirschner v. Process Design Assocs., Inc.*, 459 Mich. 587, 592 N.W.2d 707, 709–10 (1999). Nautilus denied that it has a duty to indemnify PMI from the beginning of this controversy. Whether Nautilus's failure to mention explicitly the "contractual liability" exclusion deprived Plaintiffs–Appellants of reasonable notice, or otherwise prejudiced Plaintiffs–Appellants should be addressed in the first instance by the district court. *See Morales v. Auto–Owners Ins. Co.*, 458 Mich. 288, 582 N.W.2d 776, 780 (1998) (listing elements of estoppel); *cf. Meirthew v. Last*, 376 Mich. 33, 135

---

**3.** *Cf. Jones v. Philip Atkins Constr. Co.*, 143 Mich.App. 150, 371 N.W.2d 508, 510–13 (1985) (finding a CGL policy unambiguously precluded coverage for completed operations when policy "list[ed] five 'description[s] of hazards' for which a premium could apply and for which coverage could be afforded [and u]nder Hazard No. 4, 'completed operations' the words 'not covered' were typed in and no premium was charged [and t]he schedule also indicate[d] that endorsement L9141 [the completed operations exclusion] is 'at issue' regarding the declarations of coverage").

N.W.2d 353, 354–56 (1965) (holding that the insurer was estopped from asserting a policy exclusion when the insurer only sent a general reservation of rights letter and did not raise the particular policy exclusion at issue until after insurer conducted insured's defense under a conflict of interest and three years had passed). Additionally, Plaintiffs–Appellants argue that Nautilus waived its right to assert these exclusions because Nautilus failed to mention them in its list of affirmative defenses attached to its answer. An exclusion provision is an affirmative defense that must be timely raised or it is waived. Fed.R.Civ.P. 8(c); *Carey Can., Inc. v. Cal. Union Ins. Co.,* 748 F.Supp. 8, 13–14 (D.D.C.1990) (holding that the insurer waived a policy exclusion because the first time the insurer raised the exclusion was in its motion for summary judgment, which insurer filed three years after insurer filed complaint). A defendant's failure to raise in its answer an affirmative defense is not always fatal. *Smith v. Sushka,* 117 F.3d 965, 969 (6th Cir.1997); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure,* § 1278 (3d ed.2004). In its list of affirmative defenses, Nautilus stated, "That the claims alleged against Plaintiffs are excluded from coverage." J.A. at 72 (Def.'s Affirmative Defenses). Whether Nautilus's failure to assert in its answer the "contractual liability" exclusion deprived Plaintiffs–Appellants of a fair opportunity should be addressed in the first instance by the district court. We conclude that the issues of estoppel and waiver raise questions that require further development in the district court.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's order granting summary judgment to Nautilus and RE-MAND this case for further proceedings consistent with this opinion.