TENNECO INC v AMERISURE MUTUAL INSURANCE COMPANY

Docket No. 275861. Submitted May 13, 2008, at Detroit. Decided September 9, 2008. Approved for publication October 30, 2008, at 9:10 a.m.

Tenneco Inc., the successor corporation of Monroe Auto Equipment Company, brought an action in 2003 in the Monroe Circuit Court against Amerisure Mutual Insurance Company, the successor of Michigan Mutual Insurance Company, seeking a declaration that the defendant is liable under insurance policies issued from 1956 to 1978 for all environmental cleanup expenses incurred by the plaintiff for groundwater contamination at several of Monroe's manufacturing plants and nearby landfills and seeking damages for breach of contract. The defendant moved for summary disposition, contending that it was not liable under the policies because of the plaintiff's failure to satisfy the policies' notice provisions and because the plaintiff made voluntary payments and entered into settlements without the defendant's approval in violation of provisions of the insurance policies. The defendant also claimed that the action was barred by the doctrine of laches or by the running of the period of limitations applicable to actions for breach of contract. The plaintiff filed a cross-motion for summary disposition, claiming that the language of the policies required the defendant to pay the plaintiff's claims. The court, Joseph A. Costello, Jr., J., entered several orders, including one denying the defendant's motion for summary disposition with regard to the notice, laches, and voluntary payment issues. The court also determined that the defendant had not established that it was prejudiced by the plaintiff's failures or action. Following the denial of the defendant's motion for reconsideration, the defendant appealed by leave granted.

The Court of Appeals held:

1. The plaintiff failed to provide the defendant any notice of governmental environmental cleanup demands, the functional equivalent of a lawsuit, or of any private third-party claims or demands. The failure to provide the notice required by the policies deprived the defendant of the opportunity to promptly contest its liability to the insured, participate in settlement negotiations, or

contest the plaintiff's liability. Prejudice to the defendant is clear because the plaintiff waited years after its liability had been cemented by its own settlements, stipulations, and consent decrees before seeking insurance payments. The trial court erred by not granting the defendant summary disposition on this issue.

2. The plaintiff's lawsuit is time-barred by the six-year statute of limitations applicable to actions for breach of contract, or under the equitable doctrine of laches.

3. The plaintiff voluntarily entered into third-party settlements, stipulations, and consent decrees with governmental agencies to take remedial action regarding environmental damages. The clear and unambiguous "voluntary payment" and the "no actions" conditions precedent in the policies preclude the defendant's liability, and the defendant is not required to prove actual prejudice to its rights. The trial court erred by not granting the defendant summary disposition on this basis as well. The orders denying the defendant's motions for summary disposition must be reversed and the matter must be remanded for the entry of a judgment in favor of the defendant.

Reversed and remanded.

1. INSURANCE — LIABILITY INSURANCE — NOTICE TO INSURERS OF OCCURRENCES — FAILURE TO PROVIDE NOTICE TO INSURERS — PREJUDICE TO INSURERS.

An insurer who seeks to cut off its responsibility under a liability insurance policy on the ground that its insured did not comply with a provision in the policy that requires notice of an occurrence to which the policy may apply immediately or within a reasonable time must establish actual prejudice to its position.

2. LIMITATION OF ACTIONS — DECLARATORY JUDGMENTS.

A statute of limitations that bars the granting of relief on the plaintiff's underlying substantive claim also bars the same claim when stated as one seeking declaratory relief.

3. LIMITATION OF ACTIONS — INSURANCE — EQUITY — LACHES.

An insured's breach of a condition in an insurance policy requiring the insured to give the insurer notice of an occurrence to which the policy may apply or notice of subsequent claims, suits, demands, or other process, when combined with the insured's inexcusable delay of longer than the statutory limitations period before filing a suit for a claim under the policy, may provide exceptional circumstances or compelling equities for the doctrine of laches to bar the insured's claim.

4. INSURANCE — LIABILITY INSURANCE — VOLUNTARY PAYMENTS BY INSURED —
   PREJUDICE TO INSURERS.

> An insured that, in response to governmental demands that are the
> equivalent of a lawsuit, enters into stipulations and consent
> decrees with governmental agencies for remedial action regarding
> environmental damage without informing its insurer may be
> found to violate an insurance policy clause prohibiting "voluntary"
> payments or the assumption of obligations without the insurer's
> consent if the insured had other options available to it under the
> terms of the policy, such as demanding that the insurer participate
> in the matter or provide a defense; an insurer may seek enforce-
> ment of a voluntary payment provision without showing that its
> rights were actually prejudiced.

*Barris, Sott, Denn & Driker, P.L.L.C.* (by *Michael J. Reynolds*), and *Jenner & Block, L.L.P.* (by *Patricia A. Bronte, Elsa Y. Trujillo, Barry Levenstam, Christopher C. Dickinson,* and *Jennifer A. Hasch*), for the plaintiff.

*Kelley, Casey & Moyer, P.C.* (by *Timothy F. Casey* and *Nicole E. Wilinski*), for the defendant.

Before: BANDSTRA, P.J., and FITZGERALD and MARKEY, JJ.

PER CURIAM. In this action for declaratory relief and damages for breach of contract, plaintiff, Tenneco Inc., contends that environmental cleanup costs it incurred are covered under general liability and umbrella policies issued by defendant's predecessor, Michigan Mutual Insurance Company (MMIC), to plaintiff's predecessor, the Monroe Auto Equipment Company (Monroe), for periods from July 1, 1956, to July 1, 1978. Defendant Amerisure Mutual Insurance Company appeals by leave granted the trial court's denial of its various motions for summary disposition that were based on the grounds that plaintiff failed to satisfy the policies' notice provisions, that plaintiff forfeited any coverage by entering into settlements and also making

"voluntary" payments that defendant had not approved, and that plaintiff's lawsuit was time-barred. Plaintiff filed a cross-motion for summary disposition, asserting that under the policies' definition of "occurrence," an "injury in fact" during the policy period triggered coverage and that the policy language required defendant to pay "all sums" that plaintiff became liable to pay as damages for injury or property damage. We reverse and remand for entry of a judgment for the defendant.

### I. SUMMARY OF FACTS AND PROCEEDINGS

Monroe used solvents containing volatile organic compounds, trichloroethylene (TCE) and trichloroethane (TCA), to manufacture auto parts at facilities in Hartwell, Georgia, beginning in 1956; in Paragould, Arkansas, beginning in 1970; and in Cozad, Nebraska, beginning in 1961. Unaware of the danger posed to the environment, Monroe used the solvents through the mid-1980s, disposing of wastewater and sludge containing TCE and TCA at the sites of its manufacturing plants and at nearby landfills in Arkansas (Finch Road), and Nebraska (Sandhills). As a result, TCE and TCA contaminated the groundwater and Monroe incurred substantial environmental cleanup costs in the years since the contamination was discovered. Plaintiff filed this lawsuit in 2003 seeking a declaration that defendant, the corporate successor to MMIC, is liable for all environmental cleanup expenses plaintiff incurred over the years because defendant insured Monroe under general liability and umbrella policies from July 1, 1956, to July 1, 1978.

Defendant filed several motions for summary disposition, contending that the undisputed facts showed that plaintiff had failed to satisfy the policies' notice

provisions as a condition precedent to liability, and that plaintiff had forfeited any coverage by making "voluntary" payments and entering into settlements that defendant had not approved. Defendant also contends that this action is barred either by laches or the running of the six-year period of limitations applicable to contract actions. Plaintiff filed a cross-motion for summary disposition, asserting that under the policies' definition of "occurrence,"[1] coverage was "triggered" by an "injury in fact"[2] during the policy period and that the policy language required defendant to pay "all sums" that plaintiff became liable to pay as damages for injury or property damage.

The policy conditions pertinent to this appeal involve (1) notice of occurrence, (2) notice of claim, (3) voluntary payment, and (4) action against the company. They provide:[3]

### 4. Insured's Duties in the Event of Occurrence, Claim or Suit

(a) In the event of an **occurrence**, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses,

---

[1] The policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

[2] See *Gelman Sciences, Inc v Fidelity & Cas Co,* 456 Mich 305, 319-320, 329; 572 NW2d 617 (1998), overruled in part *Wilkie v Auto-Owners Ins Co,* 469 Mich 41, 63 (2003). In this similar case, applying similar policy language, the Court held that an "actual injury must occur during the time the policy is in effect in order to be indemnifiable, i.e., the policies dictate an injury-in-fact approach." *Gelman, supra* at 320.

[3] Both parties assert that the pertinent provisions of the various policies are substantially the same; they are paragraphs 8, 9, 10, and 11 in some policies.

shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable.

(b) If a claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this policy; and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

5. **Action Against Company[.]** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the company. [Emphasis in original.]

A. EVENTS AT COZAD, NEBRASKA

Monroe wrote a February 15, 1985, letter to MMIC stating:

This is to put you on notice of a potential claim at our plant in Cozad, Nebraska involving sudden and accidental discharge(s) to the environment. The effects of the discharge(s) were first noted in Spring and Summer 1984. Some or all of the discharges may have occurred prior to July 1, 1978.

Samuel Mostkoff, Monroe's legal counsel, sent a "follow-up" letter in October 1985 informing MMIC that, as of July 31, 1985, Monroe's cleanup costs at its Cozad plant were $454,323.00 and that Monroe was continuing to document additional expenses.

Defendant acknowledged receipt of Mostkoff's letter in correspondence dated November 1, 1985, and informed Monroe that its February 1985 letter "appears to have been misplaced." Defendant also requested all available documentation regarding the costs incurred and reserved its rights regarding coverage and compliance with the terms and conditions of the policies.

Mostkoff responded with a November 7, 1985, letter stating that the documentation defendant sought was "quite voluminous." He requested that either defendant's claims examiner "indicate exactly the information you are looking for," or that someone come to Monroe's facility for a meeting. It does not appear that defendant acted on this request.

On November 15, 1985, plaintiff and the state of Nebraska agreed to investigate and remediate groundwater contamination at the Cozad plant.

In a letter dated April 17, 1986, plaintiff informed defendant:

> This is to advise you that we have recently performed a review of sources of the groundwater contamination for the State of Nebraska. In connection with this review we have identified that some of the contamination is related to spills which occurred in connection with the delivery of these chemicals to our plant. We are reviewing our records and files, as well as the recollections of our employees, to determine the suppliers of these chemicals and/or the distributors/transporters of these chemicals to our Cozad, Nebraska plant.

> Once this information is obtained, it will be forwarded to you for your use in filing claims against these potentially-liable parties for their role in the groundwater contamination.
>
> We continue to accumulate documentation on our expenditures at Cozad in connection with the groundwater clean-up. Through December 1985 we had expended approximately $850,000 in activities related to the clean-up. These records are available for your review at Monroe headquarters.

Defendant asserts that plaintiff never documented any pre-1978 spills, nor did plaintiff demand a defense or seek indemnity. Apparently, there have never been any third-party claims or suits or potentially responsible party (PRP) letters sent to plaintiff regarding its Cozad plant.

On February 3, 1993, plaintiff sent defendant a letter (the 1993 status letter) purporting to enclose "1993 semi-annual status reports" concerning "significant environmental claims" at all five sites (the three manufacturing plants and two landfills). The parties dispute whether the referenced "status" reports were ever actually sent to defendant; however, defendant asserts this 1993 status letter was the last communication it received from plaintiff before it filed this lawsuit in 2003.

### B. EVENTS AT THE SANDHILLS LANDFILL, NEBRASKA

The Sandhills landfill is located approximately nine miles north of the city of Cozad. Plaintiff disposed of wastewater and sludge from its Cozad plant at Sandhills from August 1977 to December 1982. As part of its stipulation with the state of Nebraska on November 15, 1985, pertaining to the Cozad plant, plaintiff was precluded from disposing of sludge at the landfill. On

August 28, 1987, the Nebraska Department of Justice notified plaintiff that the Sandhills landfill had been referred to it for enforcement action. Subsequently, on September 14, 1987, plaintiff entered into a consent decree with the state of Nebraska. Other than plaintiff's letters stating that it had incurred cleanup expenditures, plaintiff did not notify defendant of any demands or claims asserted against plaintiff, nor did plaintiff demand a defense or seek indemnity.

### C. EVENTS AT HARTWELL, GEORGIA

On June 26, 1986, Monroe sent MMIC a letter stating the following:

> This is to put you on notice of a potential claim at our plant in Hartwell, Georgia involving sudden and accidental discharge(s) to the environment. The effects of the discharge(s) were first confirmed in January, 1986. Georgia was notified in March 1986. Some or all of the discharge(s) may have occurred prior to July 1, 1978.

Defendant informed plaintiff in a January 30, 1987, letter that, "[a]s of this date, we have not been notified that a claim in fact has been made." Defendant also reserved its rights under the policy "[i]f and when a claim is made."

The next information plaintiff provided defendant regarding its Hartwell plant was the 1993 status letter. Defendant responded to the status letter by informing plaintiff that the information provided "cannot be matched to any prior claim files" and by requesting additional policy and claim information. The parties did not communicate further before the 2003 lawsuit.

Plaintiff contends that in the fall of 1986 the Georgia environmental protection agency of its Department of Natural Resources required plaintiff to submit reports

on the results of test wells monitoring groundwater contamination. Plaintiff submitted a report to the Georgia Environmental Protection Division (GEPD) on January 30, 1987. On June 29, 1994, the GEPD notified plaintiff that its Hartwell property would be added to Georgia's hazardous site inventory and instructed plaintiff to submit more environmental data.

On February 7, 1995, the GEPD notified plaintiff that it was a potentially responsible party (PRP) for contamination at the Hartwell plant site. Subsequently, on April 2, 1996, plaintiff entered into a consent order with the state of Georgia regarding remediation at the plant. In addition, between 1989 and 1995, plaintiff settled third-party claims and purchased property adjacent to the plant. Plaintiff did not notify defendant of its interaction with the GEPD or of the third-party settlements.

### D. EVENTS AT PARAGOULD, ARKANSAS

On March 23, 1988, plaintiff sent defendant a letter that stated:

> This is to put you on Notice of a potential claim at our plant in Paragould, Arkansas involving sudden and accidental discharge(s) to the environment. The effects of the discharge(s) were first noted in April, 1986. Some or all of the discharges may have occurred prior to July 1, 1978.

Defendant responded in a letter dated April 19, 1988, citing the policies' conditions and informing plaintiff that "because of your failure, promptly, to report the occurrence of April of 1986 to the Michigan Mutual Insurance Company, you are in violation of that duty of your policy" that required notice of an occurrence, claim, or suit. Defendant indicated that it would investigate the loss, but reserved all rights under the policy, including denying coverage.

Plaintiff responded to defendant's reservation of rights in a letter dated June 2, 1988. Plaintiff informed defendant that it notified defendant as soon as it became aware that the policies might be involved. Plaintiff also insisted that defendant had not been prejudiced.

Plaintiff also wrote in a March 8, 1991, letter to defendant:

> Please consider this letter a supplement to our letter of March 23, 1988 in which we put you on notice of a potential liability claim concerning accidental discharge(s) into the environment at our Paragould, Arkansas manufacturing facility. A related site has been added to the Environmental Protection Agency's Superfund list. This letter is our notice to you of the potential additional liability due to this action. [4]

Defendant asserts that the 1993 status letter was the last communication from plaintiff to defendant regarding the Paragould plant before the 2003 lawsuit. Apparently, no third-party claims were filed against plaintiff relating to contamination at the Paragould plant.

E. EVENTS AT THE FINCH ROAD LANDFILL, ARKANSAS

The Finch Road landfill, also referred to as the Paragould pit or the Monroe Auto pit, is located seven miles from plaintiff's Paragould plant in Arkansas. Plaintiff dumped its waste sludge at this site from March 1973 to sometime in 1978. Groundwater contamination was discovered at the site in July 1987. On August 30, 1990, the site was added to a national priorities list as part of the Superfund[5] process under

---

[4] On appeal, plaintiff argues the "related site" mentioned in the letter is the Finch Road landfill.

[5] See 26 USC 9507.

the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 USC 9601 *et seq.* In a January 9, 1991, letter, the United States Environmental Protection Agency (EPA) notified plaintiff it was a PRP regarding the "Monroe Auto Pit Superfund Site." Plaintiff contends that its March 8, 1991, letter gave defendant notice of this EPA action, but defendant asserts that plaintiff's brief on appeal is the first time plaintiff has contended that the Paragould pit was the "related site" referred to in that letter. On March 18, 1991, plaintiff received another letter from the EPA notifying plaintiff it had 60 days to agree to conduct a remedial investigation and feasibility study or the EPA would do so itself and sue plaintiff for the expense under CERCLA. On June 28, 1991, plaintiff entered into a consent order with the EPA requiring remedial investigation and response.

On November 18, 1996, the Arkansas equivalent of the EPA sent its own version of a PRP letter to plaintiff regarding the "Monroe Auto Superfund Site." On February 5, 1998, plaintiff entered into a consent order with the Arkansas agency for remedial response.

In addition to agreeing to take remedial action with federal and state environmental agencies, plaintiff settled some third-party claims arising out of the contamination of properties adjacent to the Finch Road landfill.

Defendant asserts that plaintiff failed to provide it any notice of either governmental or private third-party demands regarding the landfill and, further, that plaintiff made no specific demand for coverage.

F. TRIAL COURT RULINGS

As noted above, defendant moved for summary disposition on the basis that plaintiff failed to satisfy the

policies' notice provisions, that plaintiff forfeited any coverage by entering into settlements that defendant had not approved and by making "voluntary" payments, and that plaintiff's lawsuit was time-barred either by the doctrine of laches, or by the running of the six-year period of limitations applicable to contract actions. Plaintiff filed a cross-motion for summary disposition, asserting that under the policies' definition of "occurrence," coverage had been "triggered" by an "injury in fact" during the policy period and that the policy language required defendant to pay "all sums" that plaintiff became liable to pay as damages for injury or property damage. The motions were argued on September 22, 2006.

The trial court issued several orders deciding the various motions. Pertinent to the present appeal, the trial court entered a single order denying defendant's motion for summary disposition that was based on notice, laches, and voluntary payment. In its order, the trial court stated that laches did not apply because plaintiff's action was not an equitable action. Although the court noted that the applicable statute of limitations governed, the court did not further address the issue. With respect to the policies' "voluntary payment" condition, the trial court suggested that the condition may not apply to payments required by a governmental agency and that the far-reaching powers of the government rendered plaintiff's response something other than voluntary. With respect to the "notice" condition, the trial court stated that plaintiff notified defendant of a potential claim when various governmental agencies advised plaintiff of the contamination. Further, the court noted that defendant stated that it would investigate, but both parties "dropped the ball" by failing to follow through. Because of defendant's own failings, the

trial court reasoned that defendant could not establish that it was prejudiced by plaintiff's failings.

With respect to plaintiff's motion, the trial court ruled that an "injury-in-fact" triggered coverage under the policies of insurance. With respect to allocation, the trial court adopted defendant's argument that "the policies should be applied using the 'time-on-the-risk' theory."

Defendant moved for reconsideration. On reconsideration, the trial court recognized that laches could apply to a breach of contract case where there were "compelling equities" or when withholding relief would be "unfair and unjust." But to apply laches, the court concluded, would require fact-finding and, therefore, the court denied reconsideration of defendant's motion regarding laches. The trial court also ruled that determining when the period of limitations began to run presented questions of fact inappropriate for summary disposition. Further, the court suggested that plaintiff's ongoing payments to remediate environmental damage "have the result of defining the claim as an active occurring event." Also, the court cryptically noted that "[t]he statute of limitations could be found to toll after payments are completed." The court further stated, "The statute of limitations could therefore toll when the government is satisfied that the claim or harm has been rectified." Although to toll the statute is to stop the limitations period from running, the context of the court's comments suggests it meant the opposite.

The trial court agreed with defendant that it did not fully address defendant's arguments regarding plaintiff's "voluntary payments" in its first ruling, but it again denied relief after concluding that a question of fact existed regarding whether plaintiff's payments were truly "voluntary" when it paid pursuant to gov-

ernmental demands. The trial court also ruled that whether plaintiff provided sufficient notice presented the essence of a material factual question for the jury to resolve.

This Court granted defendant's application for leave to appeal on July 17, 2007. Plaintiff filed a cross-appeal by right on August 6, 2007, pursuant to MCR 7.207(A)(1).

## II. STANDARD OF REVIEW

The parties' motions for summary disposition implicate MCR 2.116(C)(10) (no genuine issue of material fact), and MCR 2.116(C)(7) (immunity granted by law). This Court reviews de novo the trial court's grant or denial of summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When considering a motion under subrule C (10), the court must view the proffered evidence in the light most favorable to the party opposing the motion. *Maiden, supra* at 120. A trial court properly grants the motion when the proffered evidence fails to establish any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*.

When addressing a motion under subrule C (7), the trial court must accept as true the allegations of the complaint unless contradicted by the parties' documentary submissions. *Patterson v Kleiman*, 447 Mich 429, 434 n 6; 526 NW2d 879 (1994). If the material facts are not disputed, this Court reviews de novo as a question of law whether a claim is barred by the statute of

limitations. *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 386; 738 NW2d 664 (2007).

This case also requires the interpretation of an insurance contract. The interpretation of clear contractual language is an issue of law, which is reviewed de novo on appeal. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). Like any other contract, an insurance policy is an agreement between the parties. *Heath v State Farm Mut Automobile Ins Co*, 255 Mich App 217, 218; 659 NW2d 698 (2003). The primary goal in the interpretation of an insurance policy is to honor the intent of the parties. *Klapp, supra* at 473. If an ambiguity in the contract cannot be resolved, it should be strictly construed against the drafter. *Id.* at 471-474; *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 61; 664 NW2d 776 (2003). Further, determining the scope of coverage under an insurance policy is a separate question from whether liability is negated by an exclusion. *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 172; 534 NW2d 502 (1995). While exclusions are strictly construed in favor of the insured, this Court will read the insurance contract as a whole to effectuate the intent of the parties and enforce clear and specific exclusions. *Hayley v Allstate Ins Co*, 262 Mich App 571, 575; 686 NW2d 273 (2004).

With respect to defendant's claim of laches, this Court reviews a trial court's equitable decisions de novo, but the findings of fact supporting an equitable decision are reviewed for clear error. *Yankee Springs Twp v Fox,* 264 Mich App 604, 611; 692 NW2d 728 (2004). A decision is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake was made. *Wayne Co v Wayne Co Retirement Comm,* 267 Mich App 230, 252; 704 NW2d 117 (2005).

III. ANALYSIS

A. NOTICE

We conclude that plaintiff's "potential claim" letters were arguably sufficient to satisfy the policies' notice of occurrence condition, at least for the purposes of summary disposition. See *Wendel v Swanberg*, 384 Mich 468, 478 n 8; 185 NW2d 348 (1971) (the reasonableness of the notice given is usually a question for the trier of fact). Further, in light of defendant's failure to investigate, and because, as we hereinafter conclude, defendant's liability is precluded by other conditions or exclusions, defendant cannot establish prejudice from defective notice of an "occurrence."

On the other hand, the unrebutted evidence establishes that plaintiff failed to comply with the policies' condition requiring immediate notice of every claim, suit, demand, notice, or summons. This condition is independent of the condition requiring notice of an "occurrence." See *Koski v Allstate Ins Co*, 456 Mich 439, 445; 572 NW2d 636 (1998). Because defendant forever lost the opportunity to contest plaintiff's liability, engage in settlement negotiations, or seek a judicial determination of its liability to plaintiff under the policies, defendant has established the prejudice necessary to terminate its liability to plaintiff. *Id.* at 447-448; Wood v Duckworth, 156 Mich App 160, 163-164; 401 NW2d 258 (1986).

We conclude that both parties' tangential arguments lack merit. Plaintiff bases an argument on estoppel. However, the reasoning of *Meirthew v Last*, 376 Mich 33; 135 NW2d 353 (1965), simply does not apply to these facts because plaintiff never asked for, and defendant never undertook, plaintiff's defense; consequently, a duty of complete disclosure did not arise. A party may

be estopped to assert a fact when (1) the party by representation, admissions, or silence intentionally or negligently induces another party to believe certain facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of those alleged facts. *Van v Zahorik*, 460 Mich 320, 335; 597 NW2d 15 (1999). Silence or inaction alone is insufficient to invoke estoppel absent a legal or equitable duty to disclose. *West American Ins Co v Meridian Mut Ins Co*, 230 Mich App 305, 310; 583 NW2d 548 (1998). In *Meirthew*, the duty of full disclosure arose because the same counsel represented both the insurer and the insured in the defense of litigation against the insured, but the insurer failed to disclose the specific policy conditions it would rely on to deny coverage in the event of an adverse verdict. *Meirthew, supra* at 36-38. Here, defendant responded to plaintiff's notices of "potential claim" by informing plaintiff that it was reserving its rights to deny coverage on the basis of all the terms and conditions of the policies. Plaintiff does not allege, nor can it establish, that justifiable reliance caused it prejudice. See *Allstate Ins Co v Keillor (After Remand)*, 450 Mich 412, 416 n 2; 537 NW2d 589 (1995) (holding that the insurer was not estopped from asserting a policy defense not contained in its reservation of rights letter where the delay was not unreasonable and the insured was not prejudiced). Further, it is plaintiff's failure to notify defendant of claims, suits, and demands against it by third parties and governmental agencies, an independent policy condition, that prejudiced defendant under the facts of this case.

Likewise, we reject defendant's reliance on *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197; 731 NW2d 41 (2007). The Supreme Court in that case held that the 120-day period of MCL 691.1404(1) within which to give

notice to invoke the exception to governmental immunity with respect to a defective highway should be enforced as written, and the Court also overruled prior decisions holding that the failure to comply with the statute's terms would not bar recovery absent a showing of prejudice. Defendant asserts that the same reasoning applies by analogy to the insurance policy notice conditions, i.e., that the policy language does not require that defendant show that plaintiff's failings in providing notice caused defendant prejudice. This argument is based on an inapt analogy and would require this Court to ignore longstanding Michigan Supreme Court precedent. The requirement of MCL 691.1404(1) to give notice within 120 days after an injury caused by a defective highway is far different from a provision in an insurance policy requiring notice of an "occurrence," an event neither expected nor intended, as soon as practicable. But regardless of the merits of defendant's argument, this Court is bound by the rule of stare decisis to follow the decisions of our Supreme Court. *Griswold Properties, LLC v Lexington Ins Co*, 276 Mich App 551, 563; 741 NW2d 549 (2007). Our Supreme Court has held "that an insurer who seeks to cut off responsibility on the ground that its insured did not comply with a contract provision requiring notice immediately or within a reasonable time must establish actual prejudice to its position." *Koski, supra* at 444.

"Provisions in liability insurance contracts requiring the insured to give the insurer immediate or prompt notice of accident or suit are common, if not universal. The purpose of such provisions is to allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims." *Wendel, supra* at 477. The Court further noted that mere delay in complying with a notice condition would not forfeit coverage "because

such provisions are construed to require notice within a reasonable time." *Id.* at 478, citing *Kennedy v Dashner,* 319 Mich 491; 30 NW2d 46 (1947), and *Exo v Detroit Automobile Inter-Ins Exch,* 259 Mich 578; 244 NW 241 (1932). Pertinent to this case, the *Wendel* Court stated that "[p]rejudice to the insurer is a material element in determining whether notice is reasonably given and the burden is on the insurer to demonstrate such prejudice." *Wendel, supra* at 478 (citations omitted). These principles apply equally to "notice of accident and notice of suit although their application will differ in varying factual contexts." *Id.* at 478-479, citing *Weller v Cummins,* 330 Mich 286, 293; 47 NW2d 612 (1951). The *Koski* Court, also citing *Weller,* confirmed this last principle. *Koski, supra* at 445. But giving notice of an "occurrence" will not relieve an insured of its obligation to provide notice of subsequent claims, suits, demands, or other process. See *Aetna Cas & Surety Co v Dow Chem Co,* 10 F Supp 2d 800, 811 (ED Mich, 1998).

An insurer suffers prejudice when the insured's delay in providing notice materially impairs the insurer's ability to contest its liability to the insured or the liability of the insured to a third party. *West Bay Exploration Co v AIG Specialty Agencies of Texas, Inc,* 915 F2d 1030, 1036-1037 (CA 6, 1990). Although the question of prejudice is generally a question of fact, *Wendel, supra* at 478 n 8, it is one of law for the court when only one conclusion can be drawn from the undisputed facts. See *Wehner v Foster,* 331 Mich 113, 120-122; 49 NW2d 87 (1951). Further, "Michigan law does *not* require an insurer to prove that but for the delay it would have avoided liability." *West Bay, supra* at 1037 (emphasis in original).

> In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice,

> courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured. [*Aetna Cas, supra* at 813.]

Giving plaintiff the benefit of the doubt, we conclude that it is possible that its "potential claim" letters gave defendant notice of an "occurrence" at plaintiff's Cozad, Hartwell, and Paragould plants. Further, giving plaintiff the benefit of the doubt, a reasonable factfinder might determine plaintiff's March 8, 1991, letter referring to a "related site" portending "additional liability" with respect to plaintiff's Paragould plant might have given notice of an "occurrence" with regard to the Finch Road landfill. But there is nothing from which to infer that plaintiff gave defendant notice of an occurrence at the Sandhills landfill. Plaintiff appears to argue that notice of an occurrence at its plants also included notice of an occurrence at the nearby landfills. But the notices regarding Paragould and Cozad mention only plaintiff's "plant," not a landfill, and, because the plants and the landfills are miles apart, the notices failed to identify the "place" of the "occurrence."

But even if plaintiff complied with the policies' condition requiring notice of an "occurrence," reasonable fact-finders could only conclude that plaintiff failed to give notice of subsequent claims, suits, or demands. In this regard, both our Supreme Court and this Court have held that governmental agency demands for environmental remedial action are "suits" within the meaning of this standard liability insurance policy condition. In *Michigan Millers Mut Ins Co v Bronson Plating Co*, 445 Mich 558, 573; 519 NW2d 864 (1994), overruled in part *Wilkie, supra* at 63, our Supreme Court, in the

context of an EPA demand for environmental remediation under CERCLA, held "that the legal proceeding initiated by the receipt of [a PRP letter] is the functional equivalent of a suit brought in a court of law." Similarly, this Court in *South Macomb Disposal Auth v American Ins Co (On Remand)*, 225 Mich App 635, 668; 572 NW2d 686 (1997), held that state agency demands for environmental remediation under state environmental laws "constituted a 'suit' for purposes of triggering the insurers' duty to defend." Plaintiff contends that its 1980s and early 1990s correspondence placed defendant on notice that it faced governmental demands for environmental cleanup. While plaintiff, in some of this correspondence, stated that it had incurred environmental cleanup expenses at its Cozad plant and, in other correspondence, suggested that state or federal agencies may have been involved in determining that groundwater contamination had occurred, no correspondence from plaintiff stated that it had received a PRP letter or other governmental demand for remedial action, or that it had received a private third-party claim, suit, or demand. Further, it appears undisputed that after providing defendant with the initial notices, plaintiff settled several third-party claims and entered into several stipulations and consent orders with various governmental agencies for remedial action, all without providing defendant any specific notice of its actions.

We conclude that plaintiff prejudiced defendant by not complying with the condition requiring it to give notice of any suits or demands even if plaintiff notified defendant of an "occurrence." Although an "occurrence" triggers coverage under the policies, the policies, read as a whole, plainly provide that defendant's liability under the policies is limited to plaintiff's legal obligation to pay being determined after an actual trial

or by "agreement of the insured, the claimant, and the [insurance] company." Further, the policies prohibit the insured from voluntarily paying its believed legal obligation without the consent of the insurance company. In sum, the insurance policies cover liability to third parties. See *Gelman Sciences, Inc v Fidelity & Cas Co*, 456 Mich 305, 312; 572 NW2d 617 (1998), overruled in part on other grounds *Wilkie, supra* at 63. It is a third-party suit that triggers the insurer's duty to defend the insured and, ultimately, to indemnify the insured for sums the insured is legally obligated to pay. See *Michigan Millers, supra* at 573-575, and *American Bumper & Mfg Co v Hartford Fire Ins Co*, 452 Mich 440, 450-451; 550 NW2d 475 (1996) (general liability policy contained two separate, but related, duties of the insurer: the duty to indemnify the insured for sums the insured is legally obligated to pay for covered bodily injury or property damage and the duty to defend any suit against the insured seeking damages because of an occurrence).

Without regard to whether evidence has been lost or might be available from other sources, the lack of notice of claims, suits, or demands has forever cost defendant the opportunity to contest plaintiff's liability, engage in settlement negotiations, or seek a judicial determination of its liability to plaintiff under the policies. Thus, defendant has established the prejudice necessary to preclude any liability it may have had to plaintiff. Specifically, the lack of notice has materially impaired its ability to contest its liability to plaintiff and plaintiff's liability to the government for cleanup or for third-party claims. *West Bay, supra* at 1036-1037. This is so even if, had defendant been notified of suits or claims, the outcome might not have been different. *Id.* at 1037. Our conclusion that defendant has satisfied its burden of showing that it was prejudiced as a matter of

law is supported by the reasoning employed in *Koski, supra*; *Wood, supra*; and *Wehner, supra*.

The *Wehner* Court credited the unrebutted testimony of the insurer's assistant claims manager as establishing a prima facie case of prejudice from late notice of an occurrence. *Wehner, supra* at 122. The claims manager testified that had the insurer been promptly notified, it could have determined the question of liability, obtained competitive cost estimates regarding damages, attempted to settle the claim if there were liability, and established a reserve for future payments if damage appeared extensive. *Id*. 118-119. Defendant here lost the opportunity for a prompt determination of its liability to the insured, lost the opportunity to negotiate settlements with governmental agencies and third parties, and lost the opportunity to build reserves for future payments if liability existed and damage appeared extensive.

The insured in *Wood* waited 18 months before notifying the insurance company of a lawsuit against him. The Court observed that

> the insured neglected to notify the insurance company of the lawsuit until liability was virtually assured by the damaging admissions of the insured prior to notice, in direct contravention of the insurance agreement, the forfeiture clause of the policy, which provides that no action shall lie against the company unless, as a condition precedent, the insured has fully complied with all the terms of the policy, should take effect. [*Wood, supra* at 163-164.]

So, too, in the present case, plaintiff never notified defendant of suits, claims, or demands. It waited until after it had settled claims and entered into stipulations and consent decrees, all in contravention of policy conditions prohibiting settlements without defendant's consent.

In *Koski*, our Supreme Court held that the insurer had been prejudiced by late notice of suit even though the insurer had received prompt notice of the occurrence, which the Court referred to as "the notice-of-claim requirement." *Koski, supra* at 444. But the insured did not notify the insurer that a lawsuit had been filed until three months after entry of a default judgment. *Id.* This deprived the insurer of "any opportunity to engage in discovery, cross-examine witnesses at trial, or present its own evidence relative to liability and damages." *Id.* at 445. Although the insurer had been notified of the underlying accident, the Court found it unreasonable to impose on the insurer " 'sentry duty' " to determine if the insured were sued. *Id.* at 446, quoting *Weaver v Hartford Accident & Indemnity Co*, 570 SW2d 367, 369 (Tex, 1978). Moreover, the *Koski* Court held that the insured was not released from complying with the notice-of-suit condition precedent to the insurer's liability by the fact that the insurer had denied coverage after notice of the accident. *Koski, supra* at 441, 445. On the other hand, the Court emphasized, "an insurer who knows of legal proceedings instituted against its insured, but nevertheless chooses to rest on its claim of noncoverage, faces a heavy burden in demonstrating prejudice from its insured's failure to comply with a notice provision." *Id.* at 446 n 7. Because notice of suit was not given until three months after entry of a default judgment, which was unlikely to be set aside, the Court determined that the insurer was clearly prejudiced. *Id.* at 446.

In sum, we conclude that even if plaintiff gave adequate notice of an occurrence, it subsequently failed to provide notice of governmental environmental cleanup demands—the functional equivalent of a lawsuit—and of third-party claims and demands. Plaintiff's failure to give notice of suit deprived defendant of

the opportunity to promptly contest its liability to the insured, participate in settlement negotiations, or contest plaintiff's liability. Prejudice to defendant is clear because plaintiff waited years after its liability had been cemented by its own settlements, stipulations, and consent decrees before seeking reimbursement from defendant. The trial court erred by not granting defendant summary disposition on this basis.

### B. LACHES AND THE STATUTE OF LIMITATIONS

We conclude that although plaintiff styled this lawsuit as an action for a declaratory judgment, it is essentially a breach of contract claim that is governed by the six-year period of limitations. MCL 600.5807(8). Plaintiff's claim is for money damages based on defendant's alleged breach of its duties to defend and indemnify plaintiff as a result of the environmental claims asserted against it. In that regard, all events giving rise to plaintiff's claims, except one, occurred more than six years before plaintiff filed its complaint. Consequently, plaintiff's claims are generally barred by the statute of limitations. To the extent that plaintiff's claim regarding the February 5, 1998, Finch Road landfill consent order survives the statute of limitations inquiry, recovery against defendant is precluded by plaintiff's failure to give notice to defendant of the related November 18, 1996, PRP letter, as discussed in part III (A) of this opinion, or for breach of the "voluntary payments" and "no action" conditions, discussed hereafter in part III (C) of this opinion.

In *Taxpayers Allied For Constitutional Taxation v Wayne Co*, 450 Mich 119; 537 NW2d 596 (1995), our Supreme Court addressed the time limitations within which to bring claims for retrospective relief (a tax refund) and for prospective relief (injunctive and de-

claratory relief) for an alleged unconstitutional tax. The Court observed that it had to "analyze the time of accrual separately for each type of relief sought." *Id.* at 123. Regarding the refund, the claim accrued when the "wrong" occurred, MCL 600.5827, which was when the tax was assessed and became due. *Taxpayers, supra* at 123-124. The Court held that the pertinent one-year period of limitations, MCL 600.308a(3), applied to the refund claim. *Taxpayers, supra* at 122-126. But the plaintiff's claim for prospective relief from an alleged unconstitutional tax did not neatly fit a statute of limitations defense and to hold otherwise "would truncate the constitutional right." *Id.* at 127.

With respect to declaratory relief, the Court in *Taxpayers, supra* at 128, quoted with approval *Luckenbach Steamship Co v United States*, 312 F2d 545, 548 (CA 2, 1963):

> "Limitations statutes do not apply to declaratory judgments as such. Declaratory relief is a mere procedural device by which various types of substantive claims may be vindicated. There are no statutes which provide that declaratory relief will be barred after a certain period of time. *Limitations periods are applicable not to the form of the relief but to the claim on which the relief is based.*" [Emphasis added.]

The Court further stated that claims for declaratory relief must necessarily be based on an underlying substantive claim to satisfy the requirement that an " 'actual controversy' " exist. *Taxpayers, supra* at 128. "Once a court determines which statute of limitations applies, however, the time at which the claim accrues for purposes of applying that statute depends on the type of relief sought." *Id.* at 128 n 10. "Declaratory relief may not be used to avoid the statute of limitations for substantive relief." *Id.* at 129. Consequently, a

careful reading of *Taxpayers* leads to the conclusion that when the statute of limitations would bar granting relief on the underlying substantive claim, it also bars the same claim when stated as one seeking declaratory relief. Holding otherwise is equivalent to rendering an advisory opinion on a moot issue, one for which the relief requested cannot be granted. See *Michigan Nat'l Bank v St Paul Fire & Marine Ins Co*, 223 Mich App 19, 21; 566 NW2d 7 (1997).

MCL 600.5815 buttresses this analysis of *Taxpayers*. "The prescribed period of limitations shall apply equally to all actions whether equitable or legal relief is sought. The equitable doctrine of laches shall also apply in actions where equitable relief is sought." MCL 600.5815. This Court has held that MCL 600.5815 does not preclude the application of laches to legal actions but "evidences only a legislative intent to subject equity actions to the same statute of limitations available for law actions, thereby modifying the prior judicial practice of applying a statute of limitations by analogy in an equity action." *Eberhard v Harper-Grace Hospitals*, 179 Mich App 24, 36; 445 NW2d 469 (1989). See also *Attorney General v Harkins*, 257 Mich App 564, 568-572; 669 NW2d 296 (2003), which invoked MCL 600.5815 to apply the six-year limitations period of MCL 600.5813 to an action for injunctive relief.

There is, however, a relationship between laches and the statute of limitations. *Lothian v Detroit*, 414 Mich 160, 165; 324 NW2d 9 (1982). The doctrine of laches will not ordinarily apply if a statute of limitations will bar a claim because laches is viewed as the equitable counterpart to the statute of limitations. *Eberhard, supra* at 35, citing *Lothian, supra*. If laches applies, a claim may be barred even though the period of limitations has not run. The application of laches can shorten, but never

lengthen, the analogous period of limitations. *Citizens Ins Co of America v Buck*, 216 Mich App 217, 228; 548 NW2d 680 (1996). For laches to apply, inexcusable delay in bringing suit must have resulted in prejudice. *Id.*; *Wayne Co v Wayne Co Retirement Comm*, 267 Mich App 230, 252; 704 NW2d 117 (2005). With respect to the statute of limitations, delay alone for the prescribed period is a conclusive bar to suit. *Lothian, supra* at 165-166. Thus, laches may bar a legal claim even if the statutory period of limitations has not yet expired. *Eberhard, supra* at 35-36; *Citizens, supra.*

The true nature of a plaintiff's claim must be examined to determine the applicable statute of limitations. *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 710; 742 NW2d 399 (2007). "[T]he gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim." *Id.* at 710-711. Here, plaintiff asserts in ¶ 36 of its first amended complaint that defendant was obligated under the insurance polices "to defend and indemnify" plaintiff with respect to the environmental claims it faced. In ¶ 37, plaintiff asserts that defendant "has denied coverage, reserved the right to refuse coverage, or otherwise failed or refused to comply with its contractual duties and obligations" regarding the environmental claims brought against plaintiff. "These breaches," plaintiff alleges in ¶ 38, have deprived plaintiff of the benefits of insurance coverage. Plaintiff, in its prayer for relief, requests "actual compensatory and consequential damages" for defendant's "breaches of its insurance contracts." Consequently, the gravamen of plaintiff's complaint is breach of contract. Specifically, plaintiff alleges that defendant breached its contractual duties (1) to defend plaintiff from the environmental claims asserted against it and (2) to indemnify plaintiff for the sums it

became legally obligated to pay as a result of environmental damage. Plaintiff seeks legal relief, i.e., money damages. Accordingly, the six-year period of limitations applicable to breach of contract actions applies. *Taxpayers, supra* at 128-129; *Lothian, supra* at 171-175.

In Michigan, a breach of contract claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results." MCL 600.5827. To determine the "wrong upon which the claim is based," the parties' contract must be examined. *Scherer v Hellstrom*, 270 Mich App 458, 463; 716 NW2d 307 (2006). Here, plaintiff alleges two wrongs. First, that defendant breached its duty to defend plaintiff from the environmental claims and, second, that defendant breached its duty to indemnify plaintiff for expenses it became legally obligated to pay for response activities. In general, "a cause of action for breach of contract accrues when the breach occurs, i.e., when the promisor fails to perform under the contract." *Blazer Foods, Inc v Restaurant Properties, Inc,* 259 Mich App 241, 245-246; 673 NW2d 805 (2003). With respect to an insurer's promise to defend its insured from suits, a breach occurs when the insurer refuses to defend an action brought against its insured. *Schimmer v Wolverine Ins Co*, 54 Mich App 291, 297; 220 NW2d 772 (1974). With respect to a promise to indemnify, the period of limitations runs from "when the indemnitee sustained the loss," *Ins Co of North America v Southeastern Electric Co, Inc*, 405 Mich 554, 557; 275 NW2d 255 (1979), or "when the promisor fails to perform under the contract." *Cordova Chem Co v Dep't of Natural Resources*, 212 Mich App 144, 153; 536 NW2d 860 (1995).

As we have already noted, all events giving rise to defendant's alleged duties of performance with respect

to defending plaintiff against environmental "suits" or indemnifying plaintiff for property damage claims plaintiff became legally obligated to pay, except in one instance, occurred more than six years before this lawsuit was filed in June 2003. With respect to environmental claims, defendant's obligation to defend plaintiff would have arisen upon plaintiff's receipt of the complaint in a lawsuit seeking money for property damage or upon receipt of a governmental agency PRP letter. See *Michigan Millers, supra* at 573-575, and *South Macomb Disposal Auth, supra* at 668. Plaintiff became legally obligated for cleanup costs giving rise to plaintiff's claim for indemnity when it entered various third-party private settlements and stipulations or consent orders with various governmental agencies. Plaintiff entered one consent order within the six-year period immediately preceding the filing of this lawsuit. Specifically, plaintiff entered a consent order on February 5, 1998, with the Arkansas Department of Pollution Control and Ecology for remedial response at the Finch Road landfill. But to the extent that plaintiff's claim is based on this consent order, recovery against defendant is precluded by the policies' notice condition precedent as discussed in part III (A) of this opinion, or breach of the "voluntary payments" and "no action" conditions precedent, hereafter discussed in part III (C) of this opinion.

Plaintiff asserts two arguments regarding the statute of limitations that, though logical and having some caselaw support, we reject under the facts and circumstances of this case. First, plaintiff argues that the period of limitations did not begin to run until defendant formally denied coverage, which occurred after this lawsuit was filed. Plaintiff relies on *Schimmer, supra* at 297, which states that a cause of action for breach of the duty to defend accrues "when [the in-

surer] refused to defend the actions brought against [the] plaintiff." Although this statement is dictum, it does appear to be the general rule. Plaintiff also relies on *Jacobs v Detroit Automobile Inter-Ins Exch*, 107 Mich App 424; 309 NW2d 627 (1981), but that case is factually distinguishable in that it was based on policy language "that a demand for arbitration of a claim for uninsured motorist benefits was a condition precedent to plaintiff's right to suit." *Id.* at 431.

Plaintiff's argument that the period of limitations did not begin to run until defendant formally denied coverage fails. First, plaintiff's complaint alleges that the breach of contract had already occurred at some point before the filing of the complaint. Paragraph 37 of the complaint alleges that defendant "denied coverage, reserved the right to refuse coverage, or otherwise failed or refused to comply with its contractual duties and obligations . . . ." Further, plaintiff began incurring the expenses for which it now seeks indemnification in 1985 and notified defendant that it had incurred some of those expenses in letters dated October 3, 1985, and April 17, 1986. The first letter specifically advised that plaintiff would be making a claim against defendant for the cleanup expenses it was incurring. Defendant's November 1, 1985, response to the October 3, 1985, letter at most promised to investigate coverage while reserving its rights under the policy. It does not appear that defendant responded to the second letter, which was referenced: "Claim Concerning Cozad Groundwater Contamination." The last correspondence between the parties before the instant lawsuit was filed occurred in February 1993. Plaintiff forwarded to defendant a letter enclosing "status reports" regarding its "significant environmental claims" concerning all five sites at issue. Defendant responded on February 24, 1993, that it could not match the material presented in plaintiff's

letter to any prior claim and requested further information. Thus, by 1993, although plaintiff had asserted claims for indemnity regarding all five sites, defendant gave no indication that it would honor the claims. We conclude that the period of limitations began to run notwithstanding the lack of a formal denial by defendant. Indeed, at the very latest, the period of limitations began to run on a claim for indemnity when plaintiff became legally obligated for cleanup costs after it entered into settlements with private third parties and stipulations or consent orders with various governmental agencies.

With respect to plaintiff's claim for breach of defendant's duty to defend "suits" brought against plaintiff, defendant never refused to do so because it was never informed of any suits and because plaintiff never requested a defense. The policies themselves set forth that defendant has both a duty and the right to defend any suit for covered damages brought against plaintiff. Further, the policies require plaintiff to immediately notify defendant of such suits, which plaintiff did not do. For the reasons discussed in part III (A) of this opinion, defendant suffered prejudice from plaintiff's breach of the notice-of-suit condition. For the same reasons, plaintiff's inexcusable delay in bringing suit regarding the asserted duty to defend has prejudiced defendant. Further, plaintiff's breach of the notice condition combined with an inexcusable delay of longer than the statutory limitations period in filing suit created the "exceptional circumstances" or "compelling equities" for laches to bar this claim. *Eberhard, supra* at 35-36.

Finally, we reject plaintiff's argument that the policies' "no action" condition precedent has not yet been fulfilled and, therefore, the period of limitations could

not run. Not only must the policies be read as a whole but also so must the "no action" clause. A paragraph of a contract "must be read as a whole and together with the remaining provisions of the [contract], and not by disassociating one part thereof from the remainder." *Fox v Detroit Trust Co*, 285 Mich 669, 676; 281 NW 399 (1938). We do not read the "no action" condition as a temporal requirement for suit, i.e., a contractual statute of limitations. The "no action" condition provides:

> No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the company. [Emphasis in original.]

Although the first four words of this paragraph might possibly be read as referring to when a suit could be filed, the clause when read as a whole is a condition precedent to the insurer's liability, not a time frame within which the insured may file suit. See *Wood, supra* at 163-164, and *Coil Anodizers, Inc v Wolverine Ins Co*, 120 Mich App 118, 121-123; 327 NW2d 416 (1982).

In sum, plaintiff's claims are time-barred either by the statute of limitations or by laches.

### C. VOLUNTARY PAYMENTS AND SETTLEMENTS

Independent of the lack of notice and the untimely filing of plaintiff's complaint, we agree with defendant that plaintiff voluntarily and without defendant's approval entered into various consent decrees and incurred extensive costs to remediate environmental contamination at the five sites. Because plaintiff voluntarily entered into various consent decrees and settlements without defendant's consent, the "volun-

tary payments" and the "no action" clauses in the policies at issue preclude defendant's liability under the policies. *Coil Anodizers, supra* at 123; *Wood, supra* at 163-164; see also *Augat, Inc v Liberty Mut Ins Co*, 410 Mass 117, 122-123; 571 NE2d 357 (1991) (consent order that the insured entered into with the government for environment cleanup was "voluntary" and the insurer was not required to demonstrate prejudice before being allowed to disclaim liability under the "voluntary payments" clause).

Plaintiff argues that it did not violate the "voluntary payments" and the "no action" clauses because (1) its responses to governmental cleanup demands were not "voluntary"; (2) defendant waived its right to complain regarding plaintiff's actions by not promptly participating in a response, and (3) defendant has failed to demonstrate that it was prejudiced by plaintiff's actions. We disagree.

Plaintiff's responses to governmental cleanup demands were "voluntary" because plaintiff had other choices. In *Michigan Millers, supra* at 572-574, our Supreme Court discussed factors that differentiated a common civil liability demand from the PRP letter the EPA sent to Michigan Millers' insured. The Court held, "Taking into account the various components of this PRP letter and its ramifications, we find that the legal proceeding initiated by the receipt of that notice is the functional equivalent of a suit brought in a court of law." *Id.* at 573. The Court noted that the administrative record created after the PRP letter would be critical, that CERCLA essentially imposed strict liability, that the PRP letter carried immediate and severe implications, including that the EPA could take whatever action it deemed necessary, subject only to later review for an abuse of discretion. *Id.* at 573-574. The Court opined:

>The EPA's powers may also be viewed as coercing the "voluntary" participation of PRPs. The entire CERCLA scheme revolves around "encouraging" PRPs to engage in voluntary cleanups. Only in so doing may a PRP have a voice in developing the record that will be used against it and in determining the amount of its liability through selection of investigatory and remedial methods and procedures. The significance of these incentives is underscored by the fact that EPA-conducted CERCLA actions have historically been considerably and, some would suggest, needlessly more expensive than those actions conducted by PRP groups. [*Id.* at 574-575.]

Plaintiff relies on the passage above to argue that its responses to governmental cleanup demands were not voluntary. Clearly, coerced action cannot be voluntary. Read in context of the Court's opinion, however, the quoted comment does not mean voluntary cooperation with the government after receiving a PRP letter is involuntary. Rather, in context, the quoted comment must mean that when faced with the harsh reality of potentially worse alternatives under the CERCLA, cooperation with the government is the wisest choice.

Defendant cites *Augat, supra* at 122-123, which holds that the insured voluntarily consented to an order with the government for environmental cleanup. In *Augat,* the insured's manufacturing plant discharged contaminated wastewater into a municipal sewer system. The Massachusetts Department of Environmental Quality Engineering (DEQE) drafted a complaint against Augat seeking damages, injunctive relief, and civil penalties under Massachusetts's law. The complaint was simultaneously filed with a consent order signed by Augat and the commonwealth and a proposed judgment, which judgment was entered four days later. The judgment imposed civil penalties and required that Augat decontaminate the site at its own expense. *Id.* at 118-119. Although Augat wrote to Liberty Mutual a

week after the entry of the consent order advising that " '[a] situation has arisen . . . which may give rise to a claim' " under the comprehensive general liability policy covering the plant, Augat did not advise Liberty Mutual of the consent order until almost 2½ years later. *Id.* at 119. Subsequently, Augat submitted a claim for several million dollars for past and future remediation expenses, which Liberty Mutual denied. *Id.* Augat sued Liberty Mutual for breach of contract and other claims. *Id.* Liberty Mutual moved for summary disposition on the basis of the policy's "voluntary payment" clause, which is identical to that at issue in the present case and provides, in part, " 'The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.' " *Id.* at 119 n 3.

Augat argued in opposition that "it did not violate the voluntary payment provision because its consent to judgment was not 'voluntary,' but was coerced by the threat of a more costly verdict." *Id.* at 120. The court addressed this argument as follows:

> The question then becomes whether, by entering into a consent judgment, Augat "voluntarily" assumed the obligation to fund the cleanup, thus releasing Liberty Mutual from the duty to indemnify under the voluntary payment provision of the policy. We conclude that the assumption of the obligation was "voluntary" for present purposes. Here, as Augat urges, we give a seemingly unambiguous term of the insurance policy its common, ordinary meaning. Webster's defines "voluntary" variously as "by an act of choice," "not constrained, impelled, or influenced by another," "acting or done of one's own free will," and adds that the word "implies freedom from any compulsion that could constrain one's choice." Webster's Third New International Dictionary 2564 (1961). Augat suggests that, under this definition, its settlement with the DEQE was

not "voluntary" because the company did not *want* to assume the considerable expense of cleaning up the site of the spill. Instead, according to Augat, the company was presented with a "Hobson's choice": it could accept the settlement DEQE offered or risk paying treble damages following a suit. We conclude that the decision was "voluntary," however, because Augat had an alternative—it had the right to demand that Liberty Mutual defend the claim and assume the obligation to pay for the cleanup. Nevertheless, Augat failed to exercise this right. Thus, while Augat's decision obviously was not "voluntary" in the sense of "spontaneous" or entirely free from outside influence, it was "voluntary" in the sense of "by an act of choice." Therefore, we conclude that the voluntary payment clause, if applied literally, would remove the cleanup costs from the scope of coverage under the policy. [*Augat, supra* at 121-122 (citations omitted; emphasis in original).]

The United States District Court for the Eastern District of Michigan in *Aetna Casualty, supra* at 813, applying Michigan law in a similar pollution case addressing insurance coverage, addressed the question whether Dow Chemical's responses to governmental demands were "voluntary" within the meaning of the same general liability policy condition. The district court, using reasoning similar to that in *Augat*, also concluded that Dow Chemical had made "voluntary payments." Dow had argued that it had a legal obligation that left it with no choice but to respond as it did. *Id.* at 831. The court rejected this argument, opining "that the insured has other options under circumstances such as those presented here; i.e., the option to demand that its insurers participate in the matter for which it seeks coverage or the option to at least notify its insurers in advance of taking actions for which it later seeks indemnification." *Id.* at 832.

Although neither *Augat* nor *Aetna Casualty* is binding precedent, the reasoning they employ regarding the

meaning of the "voluntary payment" clause is persuasive. Both courts applied principles of construction Michigan courts would employ when interpreting identical language in a general liability policy in a strikingly similar factual setting. Michigan courts also "examine the language in the contract, giving it its ordinary and plain meaning," *Wilkie, supra* at 47, and may resort to a dictionary such as *Webster's* to establish the meaning of a term, *Citizens Ins Co v Pro-Seal Service Group, Inc*, 477 Mich 75, 84; 730 NW2d 682 (2007). Further, Michigan courts will enforce clear and unambiguous exclusions in insurance policies unless contrary to Michigan law or policy. See *Linebaugh v Farm Bureau Mut Ins Co*, 224 Mich App 494, 503-505; 569 NW2d 648 (1997), and *Lee v Auto-Owners Ins Co (On Second Remand)*, 218 Mich App 672, 676; 554 NW2d 610 (1996).

In the present case, as in *Augat*, plaintiff failed to notify defendant of both third-party claims and governmental environmental cleanup demands that under Michigan law were the equivalent of a lawsuit that would trigger an insurer's duty to defend the insured. Consequently, plaintiff had choices regarding how to respond to the receipt of governmental PRP letters, including demanding that defendant provide a defense. *Augat, supra* at 121-122. The insurer's duty to defend its insured under a general liability policy is broader than the duty to indemnify. *American Bumper & Mfg Co v Hartford Fire Ins Co*, 452 Mich 440, 450; 550 NW2d 475 (1996). "If the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense." *Id.* at 450-451. Consequently, plaintiff voluntarily made payments, assumed obligations, and incurred expenses within the meaning of the "voluntary payments" clause in the policies. Unless the clause is contrary to public policy, or defendant waived its application, plaintiff's

breach of this condition precedent relieved defendant of liability. *Coil Anodizers, supra* at 121-123; *Lee, supra* at 676.

The closely related "no action" condition precedent is also pertinent. It is not disputed that plaintiff's obligation to remediate the pollution or pay settlements was not determined "by judgment against the insured after actual trial" or by a written agreement to which defendant was a party. Consequently, unless this condition precedent is contrary to public policy or defendant waived its application, plaintiff's breach has relieved defendant of liability.

Plaintiff argues that neither the "voluntary payment" nor the "no action" clause shields defendant from liability because defendant has not established that it was prejudiced. Although there is longstanding precedent requiring a showing of actual prejudice to void insurance coverage on the basis of the insured's failure to comply with contractual provisions requiring notice immediately or within a reasonable time, *Koski, supra* at 444, no such judicial requirement has been grafted onto the "voluntary payment" and "no action" clauses at issue here. To do so now would be contrary to settled principles of contract interpretation. While exclusionary clauses in insurance contracts are strictly construed in favor of the insured, clear and specific exclusions must be enforced as written. *Brown v Farm Bureau Gen Ins Co*, 273 Mich App 658, 661; 730 NW2d 518 (2007).

This Court has determined the "voluntary payment" and "no action" clauses here at issue to be clear and unambiguous and has enforced them as written without a showing of prejudice. In *Coil Anodizers*, the plaintiff allegedly produced defective anodized aluminum sheets that yellowed on exposure to sunlight. Coil's customer

(Prime) notified Coil that it would look to Coil to reimburse any expenses it might incur to its own customer (Avion). Coil notified Wolverine, its liability insurer, but Wolverine denied coverage and refused to defend Coil. Although no lawsuit was ever filed, Coil settled the claim. *Coil Anodizers, supra* at 120. Wolverine's policy, like the ones in this case, provided that the insurer would pay all sums that the insured shall become legally obligated to pay for covered damages and contained the identical "voluntary payment" and "no action" clauses. *Id.* at 120-121. This Court found the clauses to be unambiguous conditions of Wolverine's liability, opining:

> The language of the contract's "no action" clause clearly contemplates that the insured's liability to the claimant shall first be fixed by formal judgment or be formally acquiesced in by defendant as a condition precedent to recovery. Neither a judgment nor formal consent . . . was obtained here. Accordingly, plaintiff's settlement . . . effectively excused defendant from liability. [*Id.* at 123.]

At least one subsequent panel of this Court has read *Coil Anodizers* as holding that an insurer need not show prejudice to enforce "voluntary payment" and "no action" clauses.[6] Further, in *Giffels v Home Ins Co*, 19 Mich App 146; 172 NW2d 540 (1969), on which the *Coil* Court relied in part, a showing of actual prejudice was not required before the insured's voluntary settlement relieved the insurer of liability. In *Giffels*, the insurance policy conditioned payment upon a prior determination that the insured be found legally liable and also reserved to the insurer the right to adjust the claim and to conduct and control the defense of the insured. *Id.* at 152. The Court held that under the terms of the policy

---

[6] *Dupuis v Utica Mut Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued April 25, 2006 (Docket No. 250766).

and an express cautionary instruction by the insurer, the insured was not entitled to settle the claim without the consent of the insurer. *Id.* The Court further held that the plaintiff by his unauthorized settlement with the claimant, "improperly denied [the insurer] the right to effect an adjustment of the claim or to conduct a defense," thereby releasing the defendants from liability. *Id.* at 153. The *Giffels* Court found no need for the insurer to show actual prejudice.

Similarly, the *Augat* court rejected the insured's argument that the insurer be required to show actual prejudice from the insured's breach of the "voluntary payments" clause to relieve the insurer of liability. The court explained that "the purpose of the policy provision in question is to give the insurer an opportunity to protect its interests." *Augat, supra* at 123. The court stated:

> After Augat agreed to a settlement, entered into a consent judgment, assumed the obligation to pay the entire cost of the cleanup, and in fact paid a portion of that cost, it was too late for the insurer to act to protect its interests. There was nothing left for the insurer to do but issue a check. We conclude, therefore, that no showing of prejudice is required in this case . . . . [*Id.*]

The *Augat* court's reasoning applies to the present case. See also *Wood, supra* at 163-164.

Plaintiff cites several federal court decisions to the contrary, including *Aetna Cas, supra* at 833-834, in which the court predicted that the Michigan Supreme Court would apply a prejudice requirement to the "voluntary payment" and "no action" conditions similar to that with respect to "notice" of occurrence or suit conditions. In general, these federal decisions are either factually distinguishable or are simply not persuasive given this Court's decision in *Coil Anodizers*. Further,

this Court explicitly rejected a prejudice requirement with respect to an analogous requirement in an uninsured motorist insurance provision that an insured not settle a claim against a third-party tortfeasor without the consent of the insurer. See *Lee, supra* at 676 (clear and specific exclusions contained in policy language must be given effect without incorporating a condition of prejudice), and *Linebaugh, supra* at 506-507 (concluding that the plaintiff's "conduct clearly violated the exclusion providing that coverage did not apply to any claim settled without the insurer's consent [and] neither 'lack of prejudice' nor 'lack of reasonableness' " was a sufficient ground for ignoring clear policy language). Consequently, we conclude that the clear and unambiguous "voluntary payment" and the "no action" conditions must be enforced as written without requiring the insurer to prove actual prejudice to its rights.

Finally, plaintiff argues that defendant waived the application of both the "voluntary payment" and the "no action" conditions. We reject this argument for the same reason this Court rejected a similar one in *Coil Anodizers*. The Court held that Wolverine did not waive the "no action" clause by refusing to defend Coil Anodizers because "an insured must show that the insurer both denied liability *and* refused to defend an *action* brought against the insured." *Coil Anodizers, supra* at 124 (emphasis in original). No waiver occurred because no lawsuit was ever filed. *Id*. Similarly, here, defendant was not notified of any third-party suits or governmental PRP demands, nor did plaintiff request that defendant defend it from any such claims or suits. Consequently, defendant could not have waived either the "voluntary payment" or the "no action" conditions. Moreover, " '[a] waiver is a voluntary relinquishment of a known right.' " *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 204; 747 NW2d 811 (2008), quoting *Dahrooge*

*v Rochester German Ins Co*, 177 Mich 442, 452-452; 143 NW 608 (1913). No waiver occurred here.

### D. CONCLUSION

Because of our resolution of the issues discussed in parts III (A), (B), and (C), it is unnecessary for this Court to address the issues raised in plaintiff's cross-appeal. Plaintiff's cross-appeal is moot in light of our resolution of defendant's issues. An issue is moot if an event has occurred that renders it impossible for the court to grant relief. *Michigan Nat'l Bank, supra* at 21.

We conclude that the undisputed facts established that plaintiff failed to provide defendant any notice of governmental environmental cleanup demands (PRP letters), the functional equivalent of a lawsuit, or of any private third-party claims or demands. Plaintiff's failure to give notice of suit deprived defendant of the opportunity to promptly contest its liability to the insured, participate in settlement negotiations, or contest plaintiff's liability. Prejudice to defendant is clear because plaintiff waited years after its liability had been cemented by its own settlements, stipulations, and consent decrees before seeking insurance payments. The trial court erred by not granting defendant summary disposition on this issue.

Independently, we find that plaintiff's lawsuit is time-barred by the statute of limitations, or under the equitable doctrine of laches.

Again, independently of the first two reasons, plaintiff "voluntarily" entered third-party settlements, stipulations, and consent decrees with governmental agencies to take remedial action regarding environmental damages. The clear and unambiguous "voluntary payment" and the "no action" conditions precedent preclude defendant's liability with no requirement that

defendant prove actual prejudice to its rights. Consequently, the trial court erred by not granting defendant summary disposition on this basis also.

We reverse and remand for entry of judgment for defendant. We do not retain jurisdiction.